# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Reshare Commerce, LLC,

                Plaintiff,

      v.

State Farm Mutual Automobile Insurance
Company and American Family Mutual
Insurance Company,

                Defendants.

**MEMORANDUM**
**OPINION AND ORDER**
Civil No. 11-2617 ADM/JJG
and Civil No. 11-2616 MJD/LIB

_____

Reshare Commerce, LLC,

                Plaintiff,

      v.

The Antioch Company d/b/a Creative Memories
and subsidiaries and affiliates and
Dermalogica, Inc.,

                Defendants.

_____

Steven R. Daniels, Esq., and W. Bryan Farney, Esq., Farney Daniels, LLP, Georgetown, TX;
Dwight G. Rabuse, Esq., Joshua P. Brotemarkle, Esq., and Erin E. Neils, Esq., Rabuse Law Firm,
PA, Minneapolis, MN, for Plaintiff.

R. William Beard, Jr., Esq., King & Spalding LLP, Austin, TX; Barbara Berens, Esq., Berens &
Miller, PA, Minneapolis, MN, for Defendant State Farm Mutual Automobile Insurance
Company.

Robert J. Gilbertson, Esq., John W. Ursu, Esq., and Sybil L. Dunlop, Esq., Green Espel PLLP,
Minneapolis, MN, for Defendant American Family Mutual Insurance Company.

Peter R. Forrest, Esq., John M. Weyrauch, Esq., and Paul P. Kempf, Esq., Dicke, Billig & Czaja,
PLLC, Minneapolis, MN, for Defendant The Antioch Company, LLC.

Michael C. McCarthy, Esq., Maslon Edelman Borman & Brand, LLP, Minneapolis, MN; Mark
C. Nelson, Esq., Steven Geiszler, Esq., and Robert J. Needham, Esq., SNR Denton US LLP,

Dallas, TX, for Defendant Dermalogica, Inc.

_____

## I.  INTRODUCTION

On October 26, 2012, a joint claim construction hearing was held before the undersigned United States District Judge in two patent infringement actions brought by Plaintiff Reshare Commerce, LLC ("Reshare"), against two groups of defendants (collectively, "Defendants").[1] Reshare alleges Defendants infringed claims of U.S. Patent No. 6,594,641 (the "'641 Patent").

## II.  BACKGROUND

The '641 Patent, titled "Computer Facilitated Product Selling System," describes a system by which a customer may electronically purchase a product directly from a supplier "while protecting a local distributor or retailer from loss of business."  Decl. Steven R. Daniels [Docket No. 81] Ex. A ("'641 Patent") at 1:7-11.[2]  The patented system allows a customer to purchase a product directly from the product's supplier, effectively bypassing local retailers.  Id. at 2:12-17.  When the customer uses the supplier's website or other remote means to purchase the product, the customer has the option to select a retailer to credit with some or all of the "lost profits" of the sale.  Id. at 2:29-34, 6:39-43.  If the customer does not select a retailer, the system

_____

[1]  The Court granted the parties' motion to consolidate three actions brought by Reshare solely for the purpose of claim construction.  Order [Docket No. 70] (Case No. 11-2617 ADM/JJG).  However, the parties in the third action, Reshare and Dotfit, LLC, agreed to dismiss their respective claims with prejudice before the claim construction hearing.  Reshare Commerce, LLC v. Dotfit, LLC, No. 11-3010 JNE/TNL (D. Minn. Oct. 3, 2012).  In addition, certain of the defendants in the remaining two actions have also agreed with Reshare to dismiss their respective claims.  The remaining defendants in Case Nos. 11-2617 ADM/JJG and 11-2616 MJD/LIB are named in the caption above.

[2]  Unless otherwise indicated, all citations to the record are to Reshare Commerce, LLC v. State Farm Auto. Ins. Co., No. 11-02617 ADM/JJG (D. Minn. 2011), the action in which the parties filed their claim construction memoranda.

defaults to crediting the retailer "geographically closest" to the customer's address.  Id. at 2:29-

35.  After the customer completes the purchase, the supplier receives electronic order data to

ship the product and credit the appropriate retailer.  Id. at 2:47-63.  By using the patented system,

a supplier may sell products while preserving its business relationship with local retailers.  Id. at

1:53-59.

Reshare claims Defendants' sales methods infringe on its '641 Patent.  Defendants State

Farm Mutual Automobile Insurance Company and American Family Mutual Insurance Company

are insurance companies whose customers purchase insurance either directly through a website

or through an insurance agent.  See generally, Am. Compl. [Docket No. 113] ¶¶ 23-31, 41-49.

When a customer purchases insurance through a company website, he or she has the option to

select a prospective insurance agent from a list generated based on the customer's address.  See

id.  The insurance agent then receives compensation for the customer's website purchase.  See

id.  Similarly, Defendants The Antioch Company (d/b/a "Creative Memories") and Dermologica,

Inc., allow customers to purchase their products either directly through a website or through

local consultants or centers.  See generally, Am. Compl. [Docket No. 3] ¶¶ 24-29 (Case No. 11-

2616).  If a customer purchases a product online, this sale is associated with a local consultant or

center.  See id.

Defendants deny any infringement, and most defendants have alleged counterclaims

against Reshare seeking declaratory judgments of non-infringement and/or invalidity.

On August 16, 2012, Reshare and Defendants filed a Joint Claim Construction Statement

identifying 11 disputed terms (or groups of similar terms) in the '641 Patent.  Joint Claim Constr.

Stmt. [Docket No. 71] ("Joint Stmt."). These terms are at issue only with respect to Claims 1, 14, and 16. Id. at 2-5.

## III. DISCUSSION

### A. Standard of Review

Claim construction is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). In construing claims, courts should look first to intrinsic evidence, which includes the claims, the specification, and the prosecution history. Vitrionics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quotation and citations omitted). However, a patentee can choose to be "his or her own lexicographer by clearly setting forth an explicit definition for a claim term." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). Claim terms "should be construed consistently with [their] appearance in other places in the same claim or other claims of the same patent." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). In addition, the specification is usually "dispositive; it is the single best guide to the meaning of a disputed term." Vitrionics, 90 F.3d at 1582. Courts are nonetheless cautioned not to import limitations from the specification into the claims. Phillips, 415 F.3d at 1323; Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998).

While courts can consider extrinsic evidence to educate themselves about the patent and technology at issue, it is improper to rely on extrinsic evidence in construing claims unless, after

consideration of all the intrinsic evidence, ambiguity remains.  Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc., 152 F.3d 1368, 1373 (Fed. Cir. 1998); Vitrionics, 90 F.3d at 1584.  Extrinsic evidence is "evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."  Vitrionics, 90 F.3d at 1584.  Dictionaries may be useful to courts in understanding the ordinary and customary meaning of words, and courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."  Phillips, 415 F.3d at 1322-23.

## B.  Claim Construction

### 1.  "consumer"/ "end product user"

The parties agree "consumer," found in Claims 1 and 14 of the '641 Patent, and "end product user," found in Claim 16, are interchangeable terms.  See Joint Stmt. at 11-13.  Although it does not specifically address the term "end product user," the '641 Patent's specification states that "the term 'consumer' shall be treated as being interchangeable with the words 'purchaser,' 'buyer,' or 'user' of goods or commodities sold."  '641 Patent at 3:36-39.

Reshare argues that the Court should ignore the specification's definition of "consumer," or, at the most, consider it only in the alternative.  See Pl.'s Opening Claim Constr. Br. [Docket No. 80] ("Pl.'s Br.") 9.  Instead, Reshare argues the term "consumer" should be given its plain meaning.  Conversely, Defendants argue for an amended version of the definition of "consumer" provided in the specification.  According to Defendants, "consumer" should be defined as the "purchaser, buyer, or user of consumable goods."  Joint Stmt. at 3 (emphasis added).  Defendants argue the phrase "consumable goods" is in keeping with the context of the terms at issue.  Defs.'

Opening Claim Constr. Br. [Docket No. 78] ("Defs.' Br.") 19-21; Defs.' Responsive Claim

Constr. Br. [Docket No. 103] ("Defs.' Resp.") 5.

If the inventor, or patentee, of a patent has provided a specific definition for a term, the

interpreting court should give this definition deference.  See Johnson, 175 F.3d at 989; see also

Phillips, 415 F.3d at 1316 (holding where the specification reveals a special definition, the

"inventor's lexicography governs") (citation omitted).  Generally, courts presume that a patentee

intended the ordinary meaning for his or her patent terms.  Texas Digital Sys., Inc. v. Telegenix,

Inc., 308 F.3d 1193, 1204 (Fed. Cir. 2002).  However, a patentee's choice to "clearly set forth an

explicit definition of a term different from its ordinary meaning" will overcome this

presumption.  Id.  And though an inventor is "free to define the specific terms used to describe

his or her invention, this must be done with reasonable clarity, deliberateness, and precision."  In

re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

The '641 Patent specification provides an express definition for "consumer," and neither

Reshare nor Defendants establish why this definition should be ignored.  While a dictionary

definition or ordinary meaning construction of "consumer" might encompass a broader range of

activity, the '641 Patent inventor limited the term to a person who purchases, buys, or uses

"goods or commodities sold."  Reshare concedes that "to the extent that the specification is

relevant," this given definition should control.  Pl.'s Br. at 9.  Reshare has not argued as to why

the '641 Patent's definition is irrelevant, nor does it argue that the definition is unclear or

imprecise.  As such, Reshare has not provided any basis to ignore precedent favoring the

patentee's own definition.  See Texas Digital, 308 F.3d at 1204.

Defendants hew more closely to the specification's definition of "consumer," but

their proposed amendment to this definition adds the word "consumable" and subtracts the phrase "commodities sold."  The revision is unnecessary.  In the specification, the patentee attempts to streamline the purchasing experience for consumers shopping for "consumable items such as groceries, cleaning supplies, household goods, and the like . . . ."  '641 Patent at 1:16-24. Based on this language, and other similar instances in the specification, Defendants argue for a narrower construction of "consumer," focusing only on "consumable goods."

However, the specification should not routinely limit the scope of the patent's claims, as a patentee does not need to "describe all embodiments of his invention."  3M Innovative Props. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1371 (Fed. Cir. 2003).  Instead, the specification should limit the patent claims only where necessary.  See SuperGuide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 875 (Fed. Cir. 2004) ("Though understanding the claim language may be aided by the explanations in the written description, it is important not to import into a claim limitations that are not part of the claim.").  Defendants derive the phrase "consumable goods" in part from the description of a typical situation where the '641 Patent's system provides a benefit to both the supplier and retailer/distributor.  See '641 Patent at 1:16-24.  But a specific example of a patent's usefulness or application should not by itself create a limitation.  Phillips, 415 F.3d at 1310 (citation omitted).

Arguably, the phrase "goods or commodities sold" is the most important aspect of the patentee's definition, as it identifies the consumer in relationship to goods that were subject to a sales transaction.  And by itself, the phrase "goods or commodities sold" is clear and in agreement with the use of the term "consumer" throughout the specification and claims.  See, e.g., '641 Patent at 3:56-58 (discussing shipment of consumer purchases), 6:63-64 (describing transaction between consumer and supplier).

7

The Court declines to modify the definition provided by the patentee, and adopts it in its entirety.  Because the parties agree that "end product user" is an interchangeable term, the Court construes "end product user" to have the same definition.

**"Consumer"** and **"end product user"** shall mean "the purchaser, buyer, or user of goods or commodities sold."

### 2.  "retailer"

After providing the above definition for "consumer," the patent specification states:

> the term 'retailer' shall be taken to mean distributors, wholesalers, shippers, retailers to the public and to restricted markets or clientele, and any intermediary that is normally part of the series of transactions that results in the transfer of title and possession of a commodity from a supplier to a consumer.

'641 Patent at 3:40-45.  Defendants request that the Court adopt this definition verbatim.  Joint Stmt. at 2.  Reshare argues for a rejection of this express definition in favor of an ordinary meaning construction because the provided definition "is too cumbersome to be useful to a jury."  Pl.'s Br. at 11.  In the alternative, Reshare requests a construction of "retailer" that truncates the express definition, so that the definition reads: "any intermediary that is normally part of the series of transactions between a supplier and consumer."  Joint Stmt. at 2.

The '641 Patent's definition of "retailer" includes limitations of scope that may not be ignored.  The provided definition is a list of five categories: 1) distributors; 2) wholesalers; 3) shippers; 4) retailers to public and restricted markets; and 5) intermediaries in the chain of transactions for a commodity.  Standing alone, the first three categories do not necessarily limit the definition of "retailer," though they implicitly define "retailers" as businesses dealing in physical goods that require shipment and storage.  The fourth category is not an independent type of retailer but rather a clarification of the term's scope, and does not limit the term.

8

However, the fifth and broadest category, of "any intermediary," clearly limits retailers to those persons or entities involved in the "transfer of title and possession of a commodity." '641 Patent at 3:44-45.   The Court holds that the patentee's own definition of "retailer" is the most appropriate construction of the term.  As with "consumer," the ordinary meaning of the term "retailer" may prove broader than the definition provided in the specification.  But the '641 Patent's definition is reasonably clear, deliberate, and precise, and thus rebuts the presumption in favor of plain meaning.  <u>Paulsen</u>, 30 F.3d at 1480.  The '641 Patent's express definition of "retailer" limits this term to businesses involved in the transfer of legal ownership and physical possession of commodities.  The specificity of this definition supercedes ordinary meaning.  The specification also provides a clearer definition than the broad alternative Reshare suggests.

**"Retailer"** shall mean "distributors, wholesalers, shippers, retailers to the public and to restricted markets or clientele, and any intermediary that is normally part of the series of transactions that results in the transfer of title and possession of a commodity from a supplier to a consumer."

### 3.  "products"

The '641 Patent's specification does not provide express definitions for any of the remaining disputed terms, including "products."  The key dispute between the parties over this term is whether "products" encompasses both physical, consumable goods as well as intangible goods or services, such as insurance policies.  <u>See</u> Pl.'s Resp. at 4; Defs.' Resp. at 6.  Reshare argues that "products" should be given its ordinary, presumably broader, meaning.  Joint Stmt. at 3.  Defendants argue that to be consistent with several of their other proposed definitions, "products" should mean only "consumable goods."

The language of the claims themselves suggest a definition of "products" narrower than the term's ordinary meaning.  A court interpreting a claim at issue may look to other claims in the patent for "enlightenment as to the meaning of a claim term," because claim terms are "normally used consistently throughout the patent."  Phillips, 415 F.3d at 1314 (citations omitted); see also Rexnord, 274 F.3d at 1342 (". . . [A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").  Here, Claims 1 and 14 do not use the term at issue in a manner that implies a definition other than the term's ordinary meaning.  Claim 16, however, describes the sending of "order information to the supplier such that the supplier may ship to the user the products desired for purchase."  '641 Patent at 8:40-42 (emphasis added).  Similarly, Claims 13 and 15 describe the "shipment of the ordered products to the consumer."  Id. at 7:37-42, 8:11-12.  The use of the words "ship" and "shipment" imply the sale of material goods or commodities, not intangible goods or services.

While the specification does not offer an express definition, it too implies a definition of "products" which can only logically be understood to mean material goods and commodities.  The specification states that once a consumer places an order, the order data is received by the supplier on an electronic data storage device, "where the products ordered are noted for inventory and stock replacement purposes.  The corresponding products are either designated as sold from a stock inventory or added to the supplier's replacement requirements."  '641 Patent at 2:51-54.  The mailing address data is then sent to the "shipping department . . . where the product is packaged for shipment."  Id. at 2:55-57.  The patented system also allows for the coordinated shipment of multiple products: "The present invention allows for one or more warehouse or factories from which the product or products ordered by the consumer will be

shipped." Id. at 3:56-58.  The central processing unit (CPU) in the patented system may also "access a stock databank containing stock information pertaining to each warehouse . . . to confirm . . . sufficient quantities of the desired products."  Id. at 5:20-26.

Each of the above uses of the word "product" describes the sale, storage, and shipment of material goods or commodities.  Contrary to Reshare's proposed construction, a supplier would not have any reason to take inventory of intangible goods or services, nor would it require systems to monitor the depletion of its stock for such a product.  Similarly, neither the consumer nor the supplier would need to coordinate the packaging or shipping of intangible goods.  The specification clearly describes the invention in terms of physical goods; it repeatedly describes the patented system, including the shipment and storage of products, with prefaces such as "this invention," "the instant invention," and "the present invention."  See, e.g., id. at 1:63-66, 2:3, 2:13, 3:56, 4:23.  While the use of such phrases is not automatically controlling, their repeated use in connection with an embodiment may "limit the scope of the entire invention, particularly where no other intrinsic evidence suggests otherwise."  Absolute Software, Inc. v. Stealth Signal, Inc., 659 F.3d 1121, 1136 (Fed. Cir. 2011) (citations omitted).  Here, the use of these limiting phrases in the specification, the expressly defined patent terms, and the language of the claims themselves combine to limit the definition of "product" to material goods and commodities.

Although the term "product" contemplates the sale of material items, neither the specification nor the claims limit the term to "consumable" items, as Defendants propose. Defendants derive the word "consumable" primarily from an example in the "Background of the Invention" section of the '641 Patent.  In this example, the '641 Patent describes how a consumer might find it convenient to purchase a hair care product from a supplier instead of a specialty retailer.  '641 Patent at 1:16-53.  Although this example describes the sale of a

"consumable" item, neither the specification's description of the invention, nor the patent's claims, limit the products at issue to "consumable" items.  For example, the system described in the claims and specification could easily facilitate the sale of a work of art: a good or commodity that is material but not consumable.  Defendants do not demonstrate how the patent's use of the term "products" excludes such items.

**"Products"** shall mean material goods or commodities.

### 4. "supplier"

Reshare argues "supplier" does not require construction and should be given its ordinary meaning.  Joint Stmt. at 3.  Defendants argue "supplier" should be defined as "the manufacturer or wholesaler of consumable goods."  Id.  Defendants draw this definition, in part, from language in the specification that refers to the '641 Patent as a "system for purchasing directly from a supplier such as a factory or a wholesaler."  '641 Patent at 1:66-2:2; see also id. at 3:56-58.  In support of this definition, Defendants argue "supplier" should have a definition that clearly establishes its position in a "distinct portion[] of the supply chain . . ." from the retailer.  Defs.' Br. at 8.  Reshare responds that examples of suppliers provided in the specification should not serve as a limitation of the term.  Pl.'s Responsive Claim Constr. Br. [Docket No. 104] ("Pl.'s Resp.") 11.

The Court holds that "supplier" does not require construction.  The definition suggested by Defendants derives solely from an example in the specification and some questionable implications, and as such unnecessarily narrows the term.  See SuperGuide, 358 F.3d at 875.  "Supplier" is not a complex or sophisticated term in the context of the '641 Patent, and should have its ordinary meaning as interpreted by a person of ordinary skill in the art.  Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of

ordinary skill in the field of invention through whose eyes the claims are construed").  In

addition, Defendants' concern that "supplier" must describe a separate position from "retailer" in

the chain of sale is addressed by the language of the claims themselves.  For example, Claim 1

describes a transaction between a supplier and a consumer, with the retailer specifically

identified as playing no part in the transaction.  '641 Patent at 6:60-64.  This language

necessarily establishes the supplier and retailer occupy different positions in the transaction.

Further elaboration is unnecessary.

>    **"Supplier"** shall have its ordinary meaning.

>    **5. "address"**

The parties dispute the scope of information covered by the term "address."  Reshare

argues that "address" should mean "zip code or other address information."  Joint Stmt. at 4.

Defendants argue that the term should be given its ordinary meaning.  Id.  In the alternative,

Defendants argue "address" should mean "mailing address."  Id.

Although the claims at issue do not expressly define "address," they offer context useful

in the term's construction.  Claims 1 and 14 describe a data storage system that retains

"addresses for a plurality of third party retailers," which allows the CPU to determine the retailer

geographically closest to the "consumer address."  '641 Patent at 6:51-55, 7:63:67.  Claim 16

similarly describes a system for storing a plurality of retailer "addresses," and using this

information in relation to the "desired delivery address."  Id. at 8:16-24.  It also discusses

identifying retailers within a predetermined "geographic range of the delivery address."  Id. at

8:28-9.

In support of its proposed construction, Reshare argues that the ordinary meaning of the

term "address," and the alternative "mailing address" definition, exclude an embodiment

described in the specification.  Pl.'s Br. at 15.  Specifically, Reshare points to an embodiment in which the patented system identifies suitable third party retailers for a transaction based on the retailer's "geographic proximity to the consumer's zip code."  '641 Patent at 4:65-5:1. Defendants argue that this description is but one step of a larger embodiment that requires mailing address information, and thus the ordinary meaning of "address" would not preclude the described embodiment.  Defs.' Resp. at 9-10.

Reshare's proposed construction is unnecessary.  In the embodiment Reshare identifies, the '641 Patent first discusses the collection of "mandatory fields" of information from the consumer, including the "desired product destination address."  '641 Patent at 4:54-56.  Once the consumer inputs this information, the embodiment describes potentially using the consumer's zip code to identify suitable retailers nearby.  Id. at 4:65-5:1.  Because a delivery address necessarily includes zip code information, the ordinary meaning of "address" does not exclude this embodiment.

The context provided in the disputed claims further warrants an ordinary meaning construction.  If "address" meant "zip code or other address information," it would render unworkable the system contemplated by the disputed claims.  The claims require the calculation of distances between a consumer address and nearby retailers, and then the comparison of those distances to determine which is the shortest distance.  '641 Patent at 6:51-55, 7:63-67, 8:34-39. The use of zip codes or other undefined information would not allow for such determinations within the same zip code.  Also, the phrase "delivery address" necessarily implies the identification of a discrete location for the shipment of the consumer's purchased products.  Id. at 8:21-24.  This is particularly true given the language of Claim 16, which discusses the shipment of products by the supplier.  Id. at 8:39-41.

**"Address"** shall have its ordinary meaning.

### 6. "geographically closest"

The parties also dispute the scope of the term "geographically closest."  Reshare argues that the Court should construe the term to have its ordinary meaning, or, in the alternative, to mean "the nearest region or location to an identified region or location."  Joint Stmt. at 4. Defendants argue that "geographically closest" should mean "physically closest."  As discussed above, the disputed claims themselves discuss locating the third party retailer "geographically closest" to a consumer's address for purposes of compensation if the consumer declines to choose a retailer.  See, e.g., '641 Patent at 6:56-61.

The term "geographically closest" does not require construction.  As evident in the '641 Patent and as discussed above, the patented system contemplates the calculation of distances between a consumer address and nearby retailers to determine which retailer receives compensation from a transaction.  In this context, "geographically closest" means nearest in distance between the consumer's address and the third party retailer's address.  See id. at 6:51-55.  Defendants' construction is unnecessary, and Reshare's proposed alternate definition unnecessarily complicates a straightforward term.

**"Geographically closest"** shall have its ordinary meaning.

### 7. "third party"

The '641 Patent uses the term "third party" solely as a modifier for "retailer."  In the patented system, the consumer's purchase of a product from a supplier results in the crediting of some amount of compensation to a "third party retailer," which otherwise would not have profited from the transaction.  See '641 Patent at 2:3-7.  Reshare argues the term does not need construction, while Defendants argue "third party" should mean "unrelated to the supplier."

Joint Stmt. at 3.  The dispute between the parties focuses primarily on what relationship the term "third party" describes.  According to Reshare, a "third party" retailer is a party unrelated to the <u>transaction</u> between consumer and supplier.  Pl.'s Resp. at 16.  According to Defendants, a "third party" retailer is a party unrelated to the <u>supplier</u> in such a transaction.  Defs.' Br. at 8.

The language of the disputed claims support Defendants' proposed construction.  Claim 1 describes the payment of compensation to a third party retailer that has "no participation in the transaction . . . ."  '641 Patent at 6:62-64.  Similarly, Claim 14 describes payment to a third party retailer that is "an entirely passive participant in the transaction between the supplier and the consumer."  <u>Id.</u> at 8:2-7.  If the definition of "third party" meant that the retailer had no role in the transaction, it would render each of the above phrases redundant.  Interpreting courts should avoid creating such redundancies in patent language.  <u>See, e.g.,</u> <u>Haemonetics Corp. v. Baxter Healthcare Corp.,</u> 607 F.3d 776, 781 (Fed. Cir. 2010) (holding courts should avoid construing claims in ways that render claim terms superfluous or redundant).

In addition, Claim 16 describes compensation paid to an "authorized" retailer that also has "no input into the transaction."  '641 Patent at 8:16-26, 8:43-45.  The patentee used the distinct terms "third party" and "authorized" to describe retailers in different claims, but in each instance the patentee also noted that the retailer has no role in the type of transaction contemplated by the '641 Patent.  The description of an "authorized" retailer as <u>also</u> having no input in a contemplated transaction reinforces that the term "third party" is not describing the retailer's role, as the retailer's lack of participation remains the same regardless of whether it is "authorized" or a "third party."  <u>See</u> <u>Nystrom v. TREX Co., Inc.,</u> 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed.") (citation omitted).

The specification also confirms that the term "third party" describes a separation between retailer and supplier.  In at least three instances, the specification refers to the purpose of the '641 Patent as being, in part, the protection of the "business relationship" between the supplier and the retailer.  See '641 Patent at 1:58-60, 4:4-7 (describing purpose of CPU), 5:31-39.  The need to protect the supplier-retailer relationship through the sharing of otherwise lost profits indicates a relationship of greater tenuousness than that of the relationship between an employee and employer or a parent company and subsidiary.  In other words, the '641 Patent envisions the protection of market-based, mutually-beneficial commercial relationships, not the sorts of business relationships that result from employment agreements or shared corporate ownership.

In light of the above analysis, the Court adopts the Defendants' proposed construction of "third party" as "unrelated to the supplier."  Although Reshare argues that this definition is unclear and likely to confuse a jury, the word "unrelated" best captures the meaning of the term as used in the claims and specification.

**"Third party"** shall mean "unrelated to the supplier."

**8.  "no participation in the transaction"/ "entirely passive participant in the transaction"/ "no input into the transaction"**

Reshare and Defendants agree that the three terms listed above (the "No Participation Terms") are interchangeable.  See Defs.' Br. at 15; Pl.'s Resp. at 24.  Reshare argues that the No Participation Terms are not technical, and do not require construction.  Defendants argue that the No Participation Terms should each be construed to mean "no involvement in any aspect of initiating, negotiating, finalizing, or performing on an agreed upon exchange."  Joint Stmt. at 3.  In support of their definition, Defendants cite the prosecution history of the patent, noting that the patentee envisioned the system described by the '641 Patent as applying only to those

retailers who had "no direct involvement" in the consumer transaction.  Defs.' Br. Ex. B [Docket No. 79-2] ("Office Action Response") at 11.  In the Office Action Response, the patentee described the retailer as having no role in the "procurement, shipment, or storage of the products being sold."  Id. at 9.

    Defendants argue that the patent's prosecution history warrants their proposed definition. Courts may indeed look to a patent's prosecution history as part of the intrinsic evidence defining the meaning of disputed claims.  See Markman, 52 F.3d at 980; see also Vitronics, 90 F.3d at 1582-83 (citing Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995)).  While the prosecution history may inform the patent interpretation process, it should not "enlarge, diminish, or vary" the claim limitations unless the patentee "clearly takes a position" expressing a limitation.  See Engineered Prods. Co. v. Donaldson Co., Inc., 165 F. Supp. 2d 836, 874 (N.D. Iowa 2001) (citations omitted).

    Here, however, Defendants have not demonstrated how the prosecution history, or any other intrinsic evidence, justifies their definition.  As Reshare notes, Defendants' proposed definition does not derive from language in the '641 Patent or its prosecution history.  Instead, Defendants argue that their definition "merely expands on the concepts espoused" by Reshare in previous litigation over the '641 Patent.  Defs.' Resp. at 8.  Defendants support this expansion by arguing that Reshare may not "have it both ways" by using an expansive definition of "products" and then declining to adopt a similarly broad construction for the No Participation Terms.  Id. at 9.

    Defendants do not explain the inadequacy of the ordinary meaning of the No Participation Terms.  Although Defendants look to the prosecution history, they have extrapolated a definition that has no specific basis in either the intrinsic evidence or in any

extrinsic evidence.  The Court will not depart from the ordinary meaning of a term without clear, specific justification for doing so.  This conclusion is further supported by the prosecution history, which uses language consistent with the ordinary meaning of the No Participation Terms.  See DSW, Inc. v. Shoe Pavilion, Inc., 537 F.3d 1342, 1347 (Fed. Cir. 2008) ("[A]bsent contravening evidence from the specification or prosecution history, plain and unambiguous claim language controls the construction analysis.") (citations omitted).

**"No participation in the transaction"/ "entirely passive participant in the transaction"/ "no input into the transaction"** shall have their ordinary meaning.

**9.  "compensation"/ "compensated"**

The '641 Patent describes a system by which a retailer may receive compensation from a supplier for a transaction solely between the supplier and a consumer.  See, e.g., '641 Patent at 6:59-64.  The dispute between the parties regarding the definitions of "compensation" and "compensated" is directed to the form the compensation may take.  Reshare argues that these terms should be given their ordinary meaning.  Joint Stmt. at 4.  Defendants argue that "compensation" should mean "monetary payment of some or all of the profits of the transaction." Id.  Similarly, Defendants propose that "compensated" be defined as "provided monetary payment for some or all of the profits of the transaction."  Id.  In support of their proposed constructions, Defendants cite language in the specification referring to compensation as being "calculated," as "payment," for "some or all of the profits" of a transaction.  Defs.' Resp. at 10. In addition, Defendants argue that the patentee stated in the patent's prosecution history that the '641 Patent is intended to prevent the retailer from being cut out of the loop, "monetarily speaking."  Id. (citing Office Action Response at 9).

The language of the claims at issue do not require special definitions for "compensation" and "compensated" beyond their ordinary meaning.  Claims 1 and 14 describe a retailer as receiving "appropriate compensation" for a transaction between a consumer and a supplier.  '641 Patent at 6:57-64, 8:1-4.  Similarly, Claim 16 discusses the identification of the appropriate retailer "to be compensated" for a transaction.  Id. at 8:34-39.  The preambles for Claims 1 and 14 make clear that this compensation is for "lost profits" from the consumer's transaction.  Id. at 6:39-43, 7:42-46; see also Hearing Components, Inc. v. Shure, Inc., 600 F.3d 1357, 1367 (Fed. Cir. 2010) ("In considering whether a preamble limits a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention . . . .") (quotation omitted).  Combined, the preambles and language of the claims themselves are understandable if given their ordinary meaning.  No claim language necessitates the narrowing of the claims to apply only to monetary payment.

Similarly, the specifications, while discussing payment, do not require a limitation as Defendants propose.  The '641 Patent does not state that compensation for "lost profits" from a consumer transaction must be made in the form of money.  See, e.g., '641 Patent at 2:3-7.  On the contrary, a supplier pays a retailer's compensation by crediting the retailer's account, as explained in Section III.B.10. below.  For example, a supplier could make a payment for lost profits to a retailer by offering credit against future purchases by the retailer from the supplier.  Nothing in the '641 Patent specification excludes payment of this kind.

**"Compensation"** and **"compensated"** shall have their ordinary meanings.

**10.  "credits an account"/ "crediting the designated retailer"**

As noted, the disputed claims describe the compensation of a third party retailer by crediting the retailer's account for some or all of the lost profits of a consumer transaction.  In

keeping with its proposed definitions of "compensation" and "compensated," Defendants argue that "credits an account" and "crediting the designated retailer" should mean "enters/entering an amount representing the calculated monetary compensation."  Joint Stmt. at 4.  Reshare argues that these terms should have their ordinary meaning.  Id.

As explained in Section III.B.9., above, the '641 Patent does not limit the terms "compensation" and "compensated" to monetary payment.  Similarly, the disputed "credit" terms do not require constructions limiting them to monetary calculations.  The preambles to Claims 1 and 14, combined with the specification, indicate the patented system credits a retailer for some or all of the "lost profit" from the sale of a product by a supplier to a consumer.  See, e.g., '641 Patent at 1:53-58, 2:3-7, 5:39-43, 7:43-46.  The terms at issue are not technical, and their ordinary meaning is supported by the language of the claims.  As a result, the Court finds their ordinary meaning sufficient.

**"Credits an account"** and **"crediting the designated retailer"** shall have their ordinary meanings.

### 11. "owned by the selected third party"

The patentee used the phrase "owned by the selected third party retailer" in Claim 1 to describe the account through which a retailer receives the "lost profit" from a transaction.  '641 Patent at 6:61-64.  Defendants argue that the Court should construe the phrase to mean "the selected third party retailer has legal title or possession."  Joint Stmt. at 5.  Reshare argues that phrase does not require construction.  Id.  This disagreement appears to stem from a dispute regarding whether the phrase "owned by the selected third party" retailer could mean that the account in question is actually owned or possessed by the supplier.  See Pl.'s Br. at 19; see also Defs.' Resp. at 12.  Reshare argues that the term could address accounts held or possessed by

suppliers.  Defendants argue that their proposed construction is supported, in part, by an embodiment of the '641 Patent that describes the retailer account as processed by a "payment PC [] located at each boutique."  Defs.' Br. at 33 (citing '641 Patent at 4:10-14).  According to Defendants, because the payment PC is located at the retailer, it implies the retailer owns the account managed by this PC.

The Court holds that the ordinary meaning of the phrase "owned by the selected third party" is clear.  The description of the account as "owned" by the third party retailer necessarily means that the supplier does not itself own the account.  Ownership, by its ordinary meaning, connotes legal ownership rights, if not physical possession.  Defendants' proposed definition is thus unnecessary, and the Court declines to adopt it.

**"Owned by the selected third party"** shall have its ordinary meaning.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that, in interpreting the '641 Patent, the contested terms be construed in accordance with this Order.

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 21, 2012.